Trenton R. Kashima (SBN 291405)
**BRYSON HARRIS SUCIU & DeMAY PLLC**
19800 MacArthur Blvd., Suite 270
Irvine, CA 92612
Telephone: (212) 946-9389
tkashima@brysonpllc.com

*Attorney for Plaintiffs*

*(Additional Counsel listed on Signature Page)*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

SEAN BOGGS, individually and on behalf of all others similarly situated,

Plaintiffs,

v.

STRYDER CORP. d/b/a HANDSHAKE, and HANDSHAKE AI SOLUTIONS, LLC,

Defendant.

Case No.

**CLASS ACTION COMPLAINT**

**(1) Violations of the FLSA (29 U.S.C. §§ 206, 207);**
**(2) Misclassification (Cal. Lab. Code § 2775);**
**(3) Failure to Pay Minimum Wages;**
**(4) Failure to Pay Overtime;**
**(5) Failure to Provide Meal Periods;**
**(6) Failure to Provide Rest Breaks;**
**(7) Failure to Furnish Wage Statements;**
**(8) Failure to Reimburse Expenses;**
**(9) Unlawful Deductions from Wages;**
**(10) Waiting Time Penalties;**
**(11) Failure to Pay Sick Leave Wages;**
**(12) Unfair Competition (Bus. & Prof. Code § 17200);**
**(13) Unjust Enrichment**

**JURY TRIAL DEMANDED**

Plaintiff Sean Boggs ("Plaintiff" or "Boggs"), individually and on behalf of a class of similarly situated individuals, brings this action against Defendants Stryder Corp. d/b/a Handshake and Handshake AI Solutions, LLC (collectively, "Defendants" or "Handshake AI").

## I. Introduction

1. Defendant Handshake AI Solutions, LLC is a division of Defendant Stryder Corp. d/b/a Handshake, a career networking platform that has built partnerships with approximately 1,500 universities in the United States and Europe and maintains a network of approximately 18 million students and alumni, including 3 million graduate-level individuals.

2. Handshake AI leverages these university partnerships and institutional trust to recruit individuals into AI training work for AI laboratories while classifying them as independent contractors and exercising pervasive control over their work. Handshake AI dictates the projects workers perform, when and how they perform them, and what they are paid, while denying them the wages, benefits, and protections guaranteed to employees under federal and California law.

3. Handshake AI publicly markets itself as an "expert-first" platform offering "transparent and competitive pay," "expert-level tasks," and "world-class training and upskilling" through its forum. In reality, Handshake AI funnels unsuspecting individuals into AI training work involving data annotation, on-camera conversations, video review, and assessments.

4. Handshake AI requires individuals to use Handshake AI's proprietary platforms, sets and adjusts pay rates unilaterally, imposes weekly hour caps, controls project assignments, mandates unpaid assessments and onboarding processes, and retaliates against workers who raise concerns by removing them from projects or the platform entirely. Handshake AI's actions are the hallmark of an employment relationship and incompatible with Defendants' classification of their workers as independent contractors.

5. As a direct and proximate result of Defendants' misclassification scheme, Plaintiff and putative class members have been denied minimum wages, overtime pay, meal and

rest periods, accurate wage statements, reimbursement of business expenses, and timely payment of all wages owed. This action seeks to remedy these violations on behalf of all similarly situated workers.

## II. <u>Jurisdiction and Venue</u>

6. This Court has original jurisdiction over this action pursuant to the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1332(d)(2), because: (a) this is a class action in which the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs; (b) the proposed class contains more than 100 members; and (c) at least one member of the proposed plaintiff class is a citizen of a state different from at least one Defendant. This Court also has federal question jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff asserts claims under the Fair Labor Standards Act, 29 U.S.C. § 201 et seq.

7. In addition, under 28 U.S.C. § 1367, this Court has supplemental jurisdiction over the state law claims because all claims are derived from a common nucleus of operative facts and are such that Plaintiff would ordinarily expect to try them in one judicial proceeding.

8. This Court has personal jurisdiction over Defendants. Defendants conduct business within the State of California, have purposefully availed themselves of the benefits and protections of the State of California, and have sufficient contacts with the State of California such that maintenance of this action in this Court would be consistent with traditional notions of fair play and substantial justice.

9. Divisional Assignment. Pursuant to Civil L.R. 3-5(b) and 3-2(d), this action is properly assigned to the San Francisco Division or the Oakland Division of this Court because a substantial part of the events or omissions giving rise to the claims asserted herein occurred in San Francisco County, California, where Defendants maintain their principal place of business.

10. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1) and (b)(2) because Defendants maintain their principal place of business in San Francisco, California, which is within this District, and because a substantial part of the events or omissions giving rise to the claims asserted herein occurred in this District.

## III. Parties

11. Plaintiff Sean Boggs is a natural person and citizen of the State of California. At all relevant times, Boggs performed work for Handshake AI and was classified by Defendants as an independent contractor.

12. Defendant Stryder Corp. d/b/a Handshake is a Delaware corporation with its principal place of business located at 225 Bush Street, San Francisco, California 94104.

13. Defendant Handshake AI Solutions, LLC is a limited liability company organized under the laws of the State of Delaware with its principal place of business located at 225 Bush Street, San Francisco, California 94104.

14. At all relevant times, Defendants were the agents, alter egos, servants, joint venturers, joint employers, or employees of each other. Defendants acted with the consent of the other co-defendants and within the course, purpose, and scope of their agency, service, or employment.

15. At all relevant times, Defendants acted as the employer of Plaintiff and putative class members, exercising control over the terms and conditions of their work, including but not limited to assigning projects, setting pay rates, requiring use of proprietary platforms, imposing time limits, mandating assessments, and controlling project access.

## IV. Handshake AI and its Artificial Intelligence Business Model

16. Handshake AI operates an artificial intelligence data annotation and model training platform that services AI laboratories. According to Handshake AI's own public representations, the company was created in 2024 to address "significant demand from AI labs seeking qualified talent at scale" and the fact that "finding and managing these specialized experts remained inefficient and fragmented." Handshake AI's solution is to leverage institutional trust and established university partnerships to recruit workers to perform tasks that are essential to training, evaluating, and improving AI models.

17. Handshake AI publicly claims that its “experts train large language models using their academic expertise—developing domain-specific prompts, assessing responses, and judging output quality across disciplines from law and finance to virology and music theory.” In practice, however, Handshake AI recruits not only graduate-level scholars but also undergraduate students with no specialized academic credentials, assigns them to generalist labor pools, and directs them to perform rote data annotation and assessment tasks that bear no relation to their academic training or expertise.

18. Workers recruited through this pipeline perform tasks under project codenames, including “Project Lexicon,” “Project Public Spaces,” “Project Hedgehog,” “Project Evals,” “Project Halcyon,” “Project Voyager,” and “Project Cala.” Each project involves specific AI training tasks that are integral to Handshake AI's core business.

19. Despite the employment relationship between Handshake AI and its workers, Defendants classify all workers as independent contractors. This classification is a fiction designed to deprive workers of wages, benefits, and legal protections.

20. Handshake AI’s own public representations confirm an employment relationship. Handshake AI states that it “manages everything in-house,” including “sourcing and training” workers, “ensuring quality end-to-end,” and “producing data on [its] own annotation platform.” These representations describe an employer that controls the entire work process.

21. Handshake AI exercises pervasive control over the manner and means by which workers perform their tasks, consistent with an employment relationship. Specifically, Handshake AI requires workers to use Handshake AI's proprietary platform and other platforms controlled by Defendants to perform tasks;

a. unilaterally sets all pay rates with no ability for workers to negotiate compensation;

b. assigns workers to specific projects and controls access to those projects at Defendants’ sole discretion;

c. imposes weekly hour caps on workers' available hours;

d. requires workers to complete unpaid assessments and onboarding processes as a condition of accessing paid work, including assessments that workers are forced to repeat due to Defendants' own errors;

e. dictates the tools, equipment, and platforms workers must use, including requiring specific devices for certain projects;

f. monitors worker performance through quality assurance processes;

g. removes workers from projects based on Defendants' subjective evaluations;

h. retaliates against workers who raise concerns, file disputes, or complain about working conditions by removing them from projects or the platform entirely;

i. controls worker communications through company Slack channels and mandatory Zoom calls;

j. retains the right to terminate workers' access to the platform and all projects without cause or adequate notice.

22. Workers have no meaningful ability to control how, when, or where they perform their work. They cannot negotiate pay rates, choose which projects to work on beyond accepting or declining invitations, set their own schedules beyond Defendants' hour caps, or use their own tools or platforms. Workers perform all tasks through Defendants' proprietary systems and under Defendants' direction and control.

23. Workers who attempt to assert their rights or challenge Defendants' practices face swift retaliation. Workers who file disputes about pay discrepancies, raise concerns about platform issues in Slack channels, or otherwise advocate for themselves are routinely removed from projects or offboarded from the platform entirely.

## V. Handshake AI's Policy to Require Uncompensated Off-the-Clock Work

24. Throughout the relevant period, Defendants maintained a corporate policy and practice of requiring their workers to perform substantial amounts of uncompensated, off-the-clock work as a condition of accessing paid projects. For example, Plaintiff Boggs was required to revise work submissions without compensation or perform time-consuming processes just to

begin work on the next task. This off-the-clock work was integral and indispensable to the workers' principal job duties and was performed for the direct benefit of Defendants.

**a. <u>Uncompensated Onboarding and Assessment Work</u>.**

25. Defendants required workers to complete extensive onboarding processes and assessments before being granted access to paid project work. These onboarding processes included signing up for accounts, completing training modules, and passing qualification assessments administered through Defendants' proprietary assessment hub. Workers were required to repeat assessments when Defendants' systems contained errors, further increasing uncompensated time. This onboarding and assessment work was integral and indispensable to the workers' ability to perform their assigned tasks and directly benefited Defendants by ensuring a trained workforce. Despite being required by Defendants, this work was not compensated.

**b. <u>Uncompensated Mandatory Meetings</u>.**

26. Defendants required workers to attend Zoom calls and other mandatory meetings related to project assignments, platform changes, and work instructions. Workers who attended these mandatory meetings were not compensated for that time. This meeting time was integral and indispensable to the workers' ability to perform their assigned duties and directly benefited Defendants.

**c. <u>Uncompensated Platform Setup and Technical Work</u>.**

27. Defendants required workers to set up and maintain accounts on multiple proprietary and third-party platforms, including MultiMango and Defendants' separate assessment hub. Workers were required to troubleshoot technical issues, contact support, and manage account synchronization between platforms. This was all done without compensation. The platform setup work was necessary to access paid tasks and was performed under Defendants' control and direction.

28. Defendants had actual and constructive knowledge that their workers were performing this off-the-clock work without compensation. Defendants required workers to complete onboarding and assessments before accessing paid projects, monitored workers'

progress through their platforms, and benefited directly from the trained workforce that resulted from this uncompensated labor. Despite this knowledge, Defendants failed to compensate workers for this time and failed to make any effort to track or record it.

29. The aggregate amount of uncompensated off-the-clock work performed by Plaintiff and putative class members was not de minimis. Workers spent hours completing assessments, attending mandatory meetings, setting up platform accounts, and troubleshooting technical issues—all without compensation. Over the relevant statutory period, this uncompensated time amounted to substantial hours of unpaid labor for each worker.

## VI. California's ABC Test and Establishing an Employment Relationship

30. California Labor Code § 2775 creates a presumption that a worker performing services for a hiring entity is an employee. Commonly known as the ABC test, § 2775 requires a hiring entity to establish all three prongs to prove independent-contractor status.

31. Handshake AI exercises extensive control over its workers. Defendants assign workers to specific projects, dictate which platforms to use, set time limits, impose hour caps, require unpaid assessments, monitor performance through quality assurance processes, and retaliate against workers who raise concerns. Workers have no meaningful autonomy over when, where, or how they perform their work. Under the applicable IWC Wage Order, an "employer" includes any person who "directly or indirectly, or through an agent or any other person, employs or exercises control over the wages, hours, or working conditions of any person." Defendants satisfy this definition and cannot establish that workers are free from their control and direction. Defendants cannot satisfy Prong A.

32. The work performed by Plaintiff and putative class members—AI data annotation, model training, on-camera conversations for AI data collection, video quality assurance review, and assessments—is squarely within the usual course of Handshake AI's business. Handshake AI is an AI training and data annotation company. Its workers perform the very tasks that constitute its core product and revenue source. Defendants cannot satisfy Prong B.

33. Plaintiff and putative class members are college students recruited through university partnerships. They are not customarily engaged in an independently established trade, occupation, or business of the same nature as the AI training work they perform for Defendants. They do not hold themselves out to the public as available to perform AI annotation services, do not maintain their own clients, and do not operate independent businesses. Defendants cannot satisfy Prong C.

34. Because Defendants cannot establish any of the three prongs of the ABC test, Plaintiff and putative class members are employees as a matter of California law and are entitled to all wages, benefits, and protections afforded to employees under the California Labor Code.

35. The ABC test governs Plaintiff's and class members' wage-order claims, including claims for unpaid minimum wages and overtime, because such claims are rooted in one or more wage orders or predicated on conduct alleged to have violated a wage order. Where waiting time penalty claims serve to enforce underlying overtime or minimum wage obligations of the wage orders, the ABC test is likewise appropriate to resolve the classification issue.

## VII. Plaintiff Sean Boggs's Experience

36. In the fall of 2024, Plaintiff Boggs attended Folsom Lake College and was pursuing an education in computer science.

37. While enrolled in a computer engineering course, a Handshake AI representative spoke to Boggs's class and presented Handshake AI's platform as a professional networking and job board service for university students.

38. The Handshake AI representative also used the opportunity to begin recruiting unsuspecting college students by presenting Handshake AI as a promising opportunity to work for an AI company. Plaintiff Boggs and his classmates were encouraged to register with the platform, and they did so.

39. Handshake AI began sending Boggs multiple opportunities to work for it. Plaintiff Boggs applied for multiple projects and eventually was offered a position that he accepted.

40. After registering and completing the necessary onboarding, Boggs's first project involved on-camera conversations with peers for AI monitoring and data collection. Defendants compensated Boggs at approximately $4 per chat interaction.

41. Next, Plaintiff was invited to a project but was unable to complete onboarding because Defendants required workers to use an iPhone. Boggs owns an Android device. In a similar instance, Boggs was invited to join another project but declined because Defendants initially promised to compensate workers for required headgear equipment and then withdrew that offer.

42. As Handshake AI offered Boggs more positions, he was also placed in Defendants' "generalist pool" without explanation. Though the requirements for the generalist pool are not known, Defendants required Boggs to complete hours of assessments, including demanding that he repeat the same assessments on the same day without explanation. Plaintiff Boggs was never compensated for these assessments.

43. On another project, Plaintiff Boggs was part of an initial wave of workers to perform work while Handshake AI actively monitored workers' locations.

44. Plaintiff Boggs submitted work on the project, and Handshake AI incorrectly attributed Boggs's work product as originating outside the United States. Boggs's work was then flagged by the company.

45. Viewing the situation as a technical issue, Boggs reported it to Handshake AI on a dedicated Slack channel operated by the company. A Handshake AI quality assurance representative instructed Boggs to use a "skip" option to bypass the issue. Boggs followed the instructions, and he was immediately removed from the project without explanation.

46. Following his removal, Boggs attended a Zoom call with approximately 200 other workers and raised the issue with the Handshake AI project lead. On the call, he was given vague, dismissive answers about the removal process and determination.

47. Another Handshake AI worker raised a similar concern about Handshake AI's decision-making and monitoring process on the same call, and the same project lead then threatened to offboard that worker entirely from the Handshake AI platform.

48. While offboarded on that particular project, Boggs began to apply for expert-level roles on other Handshake AI projects. He was regularly denied opportunities in subject areas for which he was qualified.

49. Since Handshake AI moved him into the aforementioned generalist pool. Rather than matching Boggs with work aligned with his computer science training, Defendants confined him to a generalist labor pool performing rote annotation tasks. Boggs formally requested to be offboarded from the generalist pool because it barred him from other opportunities on the platform. Defendants refused and told him they could not accommodate his request.

50. Throughout his time working for Handshake AI, the company instituted a 40-hour weekly cap on projects. Ongoing pay discrepancies and tracking issues arose, which Boggs and other workers observed in Defendants' Slack channels.

51. In July 2026, Handshake AI removed Plaintiff Boggs's access to its platform completely. Without the ability to access his account, Plaintiff Boggs has no way to access payment information, review any time discrepancies, or even determine whether he is being paid at all.

52. As a result of the foregoing, Boggs was denied compensation, including minimum wages for mandatory assessment time, denied overtime compensation, denied meal and rest periods, denied accurate wage statements, denied reimbursement for necessary business expenses, and subjected to retaliatory conduct for raising legitimate workplace concerns.

## VIII. CLASS ACTION ALLEGATIONS

53. Plaintiff brings this action on behalf of himself and all others similarly situated pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2), and 23(b)(3).

54. Class Period. The applicable limitations period for the Class, California Subclass, and FLSA Collective shall run from the earliest date permitted by the governing statutes of limitation through the final resolution of this action, plus any time attributable to equitable or other forms of tolling.

55. Plaintiff seeks to represent the following classes:

**Nationwide Class**: All persons in the United States who performed work for Handshake AI and were classified as independent contractors at any time during the applicable limitations period to the present (the "Class" or "Nationwide Class").

**California Subclass**: All persons who performed work for Handshake AI in the State of California and/or were subject to California labor law protections and were classified as independent contractors at any time during the applicable limitations period to the present (the "California Subclass").

56. Excluded from the Class and California Subclass are Defendants, their officers, directors, and managers; the judge) assigned to this case; and any member of the Judge(s)' immediate family.

57. Numerosity (Rule 23(a)(1)): Upon information and belief, the Class and California Subclass each consist of thousands of members, making joinder of all members impracticable. Handshake AI recruits workers from numerous colleges and universities across the United States through its university partnership program and has classified thousands of workers as independent contractors during the relevant period. Defendants have access to data sufficient to identify members of the Class and California Subclass, including records concerning workers recruited to, assigned to, compensated for, and removed from projects on Defendants' platform.

58. **Commonality (Rule 23(a)(2))**: There are questions of law and fact common to the Class and California Subclass that predominate over any questions affecting only individual members, including but not limited to:

a. Whether Defendants misclassified Plaintiff and putative class members as independent contractors;

b. Whether Plaintiff and putative class members are employees under the ABC test codified at California Labor Code § 2775;

c. Whether Defendants failed to pay minimum wages;

d. Whether Defendants failed to pay overtime compensation;

e. Whether Defendants failed to provide meal and rest periods;

f. Whether Defendants failed to furnish accurate itemized wage statements;

g. Whether Defendants failed to reimburse necessary business expenses;

h. Whether Defendants failed to timely pay all wages owed upon separation;

i. Whether Defendants' conduct constitutes unfair business practices under Business and Professions Code § 17200 et seq.; and

j. Whether Plaintiff and putative class members are entitled to damages, restitution, penalties, and other relief.

59. **Typicality (Rule 23(a)(3))**: Plaintiff's claims are typical of the claims of the Class and California Subclass. Plaintiff, like all class members, was classified as an independent contractor by Defendants, performed AI training work under Defendants' control and direction, was denied employment protections under California law, and suffered the same type of injuries as a result of Defendants' uniform policies and practices.

60. **Adequacy (Rule 23(a)(4))**: Plaintiff will fairly and adequately protect the interests of the Class and California Subclass. Plaintiff has no interests antagonistic to or in conflict with the Class or California Subclass. Plaintiff has retained experienced counsel competent in class action litigation who will vigorously prosecute this action on behalf of the Class.

61. **Predominance and Superiority (Rule 23(b)(3))**: Common questions of law and fact predominate over questions affecting only individual class members. A class action is superior to other available methods for the fair and efficient adjudication of this controversy because, among other things: (a) the prosecution of separate actions by individual class members would create a risk of inconsistent or varying adjudications; (b) individual litigation would be unduly burdensome to the courts; (c) the claims of many individual class members are too small to warrant the expense of individual litigation; and (d) class treatment will achieve economies of time, effort, and expense.

62. **Injunctive and Declaratory Relief (Rule 23(b)(2))**: Defendants have acted or refused to act on grounds that apply generally to the Class and California Subclass, such that final injunctive relief or corresponding declaratory relief is appropriate respecting the Class and California Subclass as a whole.

63. **FLSA Collective Action Allegations**: Plaintiff also brings claims under the Fair Labor Standards Act, 29 U.S.C. § 216(b), as a collective action on behalf of himself and all other similarly situated current and former workers of Defendants who were classified as independent contractors and who performed AI training, data annotation, quality assurance, or related work for Defendants during the applicable limitations period (the "FLSA Collective"). The FLSA Collective Members are similarly situated in that they were all subject to Defendants' common policy and practice of misclassifying workers as independent contractors and failing to pay them minimum wages and overtime compensation as required by the FLSA. Plaintiff and the FLSA Collective Members seek to recover unpaid minimum wages, unpaid overtime compensation, liquidated damages, attorneys' fees and costs, and other relief as authorized by 29 U.S.C. § 216(b).

64. Plaintiff reserves the right to amend the above class definitions, redefine the Class, the California Subclass, and the FLSA Collective, and add subclasses as appropriate based on further investigation, discovery, and the specific theories of liability, among other reasons.

## IX. <u>CAUSES OF ACTION</u>

### <u>Count I</u>

### Violations of the Fair Labor Standards Act

*(29 U.S.C. §§ 206, 207)*

*(On Behalf of Plaintiff and the FLSA Collective)*

65. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

66. At all relevant times, Handshake AI was an "employer" within the meaning of the FLSA, 29 U.S.C. § 203(d), and Plaintiff and the FLSA Collective Members were

"employees" within the meaning of the FLSA, 29 U.S.C. § 203(e). The FLSA defines "employ" as "to suffer or permit to work," 29 U.S.C. § 203(g), which is the broadest definition of employment that has ever been included in any one act. Under the "economic reality" test applied to FLSA claims, the totality of the circumstances establishes that Plaintiff and the FLSA Collective Members were employees and not independent contractors.

67. The factors relevant to the economic reality test weigh decisively in favor of employee status: (a) Handshake AI exercised significant control over the manner and means of workers' performance, including assigning projects, dictating platforms, imposing time caps, requiring assessments, and retaliating against workers who raised concerns; (b) workers had no opportunity for profit or loss—they were paid rates set unilaterally by Handshake AI with no ability to negotiate; (c) workers made no investment in equipment or materials beyond their personal devices, while Handshake AI provided all proprietary platforms and tools; (d) the work required no specialized skill beyond what Handshake AI trained workers to do through its onboarding and assessment processes; (e) the working relationship had no definite duration, as Handshake AI could terminate workers at will without notice; and (f) the work performed—AI data annotation, model training, and quality assurance—is integral to Handshake AI's core business.

68. Handshake AI is an enterprise engaged in commerce or in the production of goods for commerce within the meaning of 29 U.S.C. § 203(s), and/or Plaintiff and the FLSA Collective Members were individually engaged in commerce or in the production of goods for commerce within the meaning of 29 U.S.C. § 206(a) and § 207(a). Handshake AI's data annotation and model training services are provided to clients across state lines and involve the use of interstate communications networks.

69. Defendants violated 29 U.S.C. § 206 by failing to pay Plaintiff and the FLSA Collective Members the applicable federal minimum wage for all hours worked. Specifically, Defendants required Plaintiff and the FLSA Collective Members to perform substantial off-the-clock work that was integral and indispensable to their principal job duties, including but not limited to: (a) mandatory onboarding and assessment work required as a condition of accessing

paid projects; (b) mandatory meetings, including Zoom calls regarding project assignments and platform changes; and (c) platform setup, account maintenance, and technical troubleshooting across Defendants' proprietary systems. Defendants permitted this work, had actual and constructive knowledge that it was being performed, and failed to compensate workers for this time.

70. Defendants violated 29 U.S.C. § 207 by failing to pay Plaintiff and the FLSA Collective Members overtime compensation at a rate of one and one-half times the regular rate of pay for all hours worked in excess of forty hours per workweek. Defendants imposed 40-hour weekly caps on workers' available paid hours yet required workers to perform additional uncompensated work—including assessments, meetings, and platform setup—beyond those capped hours. When this off-the-clock work is included, workers regularly worked in excess of forty hours per workweek without receiving overtime compensation at the federally mandated rate.

71. Defendants' violations of the FLSA were willful within the meaning of 29 U.S.C. § 255(a). Defendants knew or showed reckless disregard for whether their conduct violated the FLSA by classifying workers as independent contractors to avoid their obligations under federal wage and hour law. Accordingly, a three-year statute of limitations applies to Plaintiff's and the FLSA Collective Members' claims.

72. As a direct and proximate result of Defendants' violations of the FLSA, Plaintiff and the FLSA Collective Members have suffered damages in the form of unpaid minimum wages and unpaid overtime compensation. Plaintiff and the FLSA Collective Members are entitled to recover their unpaid wages, an equal amount as liquidated damages, reasonable attorneys' fees, and costs pursuant to 29 U.S.C. § 216(b).

## Count II

### Misclassification Under California Labor Code § 2775

*(On Behalf of Plaintiff and the California Subclass)*

73. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

74. California Labor Code § 2775 codifies the ABC test and creates a presumption that a worker performing services for a hiring entity is an employee unless the hiring entity demonstrates that the worker satisfies all three prongs of the ABC test.

75. Defendants classified Plaintiff and California subclass members as independent contractors when they were, in fact and in law, employees. Defendants cannot satisfy any prong of the ABC test.

76. As a direct and proximate result of Defendants' misclassification, Plaintiff and California subclass members have been deprived of wages, benefits, and protections to which they are entitled as employees under California law, including but not limited to minimum wages, overtime compensation, meal and rest periods, accurate wage statements, expense reimbursement, and timely payment of wages.

77. Plaintiff and California subclass members are entitled to damages, penalties, restitution, and equitable relief.

**Count III**

**Failure to Pay Minimum Wages**

*(California Labor Code §§ 1194, 1197, 1197.1)*

*(On Behalf of Plaintiff and the California Subclass)*

78. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

79. At all relevant times, California Labor Code §§ 1194, 1197, and 1197.1 required Defendants to pay their employees at least the applicable minimum wage for all hours worked. Under the applicable IWC Wage Order (Cal. Code Regs. tit. 8, § 11070), "hours worked" means "the time during which an employee is subject to the control of an employer" and "includes all the time the employee is suffered or permitted to work, whether or not required to do so." California law does not permit an employer to avoid its minimum wage obligations by averaging total compensation over total hours worked in a given pay period.

80. Defendants failed to pay Plaintiff and California subclass members the minimum wage for all hours worked, including but not limited to time spent completing mandatory

assessments, onboarding processes, repeated assessments required due to Defendants' own errors, and other compensable work time for which no compensation was provided. These hours constitute time during which workers were "subject to the control" of Defendants and time Defendants "suffered or permitted" workers to work. Cal. Code Regs. tit. 8, § 11070.

81. As a result, Plaintiff and California subclass members are entitled to recover unpaid minimum wages, interest thereon, reasonable attorney's fees and costs pursuant to California Labor Code § 1194, and liquidated damages in an amount equal to unpaid minimum wages pursuant to California Labor Code § 1194.2. Plaintiff and California subclass members are further entitled to civil penalties, restitution, and liquidated damages under California Labor Code § 1197.1.

**Count IV**

**Failure to Pay Overtime Wages**

*(California Labor Code §§ 510, 1194)*

*(On Behalf of Plaintiff and the California Subclass)*

82. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

83. California Labor Code § 510 requires employers to pay overtime compensation at one and one-half times the regular rate of pay for all hours worked in excess of eight hours in any workday or forty hours in any workweek and double the regular rate of pay for hours worked in excess of twelve hours in any workday.

84. By misclassifying Plaintiff and California subclass members as independent contractors, Defendants failed to pay overtime compensation for hours worked in excess of eight hours per day and/or forty hours per week.

85. As a result, Plaintiff and California subclass members are entitled to recover unpaid overtime wages, interest thereon, and reasonable attorney's fees and costs pursuant to California Labor Code § 1194.

**Count V**

**Failure to Provide Meal Periods**

*(California Labor Code §§ 226.7, 512)*

*(On Behalf of Plaintiff and the California Subclass)*

86. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

87. California Labor Code §§ 226.7 and 512, as well as the applicable IWC Wage Order, require employers to provide a 30-minute uninterrupted, off-duty meal period for each work shift of more than five hours. Depending on the hours worked, a second meal period may also be owed. Where adequate meal periods are not provided, employees are entitled to one hour's compensation at their regular rate of pay.

88. By misclassifying Plaintiff and California subclass members as independent contractors, Defendants failed to provide compliant meal periods, failed to record when meal periods started or stopped, failed to relieve workers of all duties, and failed to pay premium wages in lieu of compliant meal periods.

89. As a result, Plaintiff and California subclass members are entitled to recover one additional hour of pay at the employee's regular rate of compensation for each workday that a compliant meal period was not provided, pursuant to California Labor Code § 226.7, as well as interest, penalties, attorneys' fees, and costs.

**Count VI**

**Failure to Provide Rest Breaks**

*(California Labor Code § 226.7)*

*(On Behalf of Plaintiff and the California Subclass)*

90. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

91. Pursuant to California Labor Code § 226.7 and the applicable IWC Wage Order, employers must authorize and permit 10-minute uninterrupted, off-duty rest breaks for each work shift of 3.5 hours or more. Depending on the hours worked, additional rest breaks may be owed. Where a required rest break is not provided, employees are entitled to one hour's compensation at their regular rate of pay.

92. By misclassifying Plaintiff and California subclass members as independent contractors, Defendants failed to authorize and permit compliant rest breaks, failed to pay workers for rest breaks if taken, and failed to pay premium wages in lieu of compliant rest breaks.

93. As a result, Plaintiff and California subclass members are entitled to recover one additional hour of pay at the employee's regular rate of compensation for each workday that a compliant rest break was not provided, as well as interest, penalties, attorneys' fees, and costs.

**Count VII**

**Failure to Furnish Accurate Itemized Wage Statements**

*(California Labor Code § 226)*

*(On Behalf of Plaintiff and the California Subclass)*

94. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

95. California Labor Code § 226(a) requires employers to furnish each employee, semi-monthly or at the time of each payment of wages, an accurate itemized wage statement showing, inter alia, gross wages earned, total hours worked, all deductions, net wages earned, the inclusive dates of the period for which the employee is paid, the name and address of the legal entity that is the employer, and the employee's name and last four digits of the social security number.

96. By misclassifying Plaintiff and California subclass members as independent contractors, Defendants failed to provide any itemized wage statements as required by law.

97. As a result, Plaintiff and California subclass members have suffered injury and are entitled to recover penalties of $50 for the initial pay period violation and $100 for each subsequent violation, up to an aggregate penalty of $4,000 per employee, plus costs and reasonable attorney's fees pursuant to California Labor Code § 226(e).

**Count VIII**

**Failure to Reimburse Necessary Business Expenses**

*(California Labor Code § 2802)*

*(On Behalf of Plaintiff and the California Subclass)*

98. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

99. California Labor Code § 2802 requires employers to indemnify employees for all necessary expenditures or losses incurred by the employee in direct consequence of the discharge of their duties. For claims under § 2802, which is not rooted in a wage order, the multi-factor Borello test may apply to determine employment status, in addition to or in lieu of the ABC test. Regardless of which test applies, Defendants satisfy the definition of an employer given their pervasive control over workers' wages, hours, tools, and working conditions.

100. Plaintiff and California subclass members incurred necessary business expenses in connection with their work for Defendants, including but not limited to costs for internet access, personal computers, smartphones, specialized equipment (such as headgear required for certain projects), and other tools necessary to perform assigned tasks.

101. Defendants failed to reimburse Plaintiff and California subclass members for these necessary business expenses.

102. As a result, Plaintiff and California subclass members are entitled to recover indemnification for all necessary business expenses, plus interest and reasonable attorney's fees.

**<u>Count IX</u>**

**Unlawful Deductions from Wages**

(California Labor Code §§ 221-223)

(On Behalf of Plaintiff and the California Subclass)

103. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

104. California Labor Code §§ 221 through 223 prohibit an employer from collecting or receiving from an employee any part of wages previously paid to the employee or secretly paying a lower wage than promised. The applicable IWC Wage Order further restricts

deductions from wages except in narrow circumstances involving gross negligence or dishonest or willful acts.

105. Despite these requirements, Defendants made or required unlawful deductions from workers' wages by requiring Plaintiff and California subclass members to absorb costs and losses associated with performing Defendants' work, including costs for required platforms, devices, equipment, account setup, technical troubleshooting, and other expenses necessary to obtain or perform assigned work.

106. Plaintiff and California subclass members are entitled to recover their damages, penalties, interest, costs, and attorneys' fees based on these violations.

**Count X**

**Waiting Time Penalties**

*(California Labor Code §§ 201-203)*

*(On Behalf of Plaintiff and the California Subclass)*

107. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

108. California Labor Code §§ 201 and 202 require employers to pay all wages earned and unpaid at the time of discharge or within 72 hours of an employee's voluntary departure.

109. California Labor Code § 203 provides that if an employer willfully fails to pay wages owed upon termination, the employee's wages shall continue as a penalty from the due date at the same rate until paid or until an action is commenced, but not exceeding thirty days.

110. Defendants willfully failed to pay Plaintiff and California subclass members all wages earned at the time of their discharge or separation from employment, including workers who were offboarded or removed from the platform. Workers removed from projects (such as Plaintiff, who was removed from Project Voyager without explanation) and workers who ceased performing work due to Defendants' persistent pay discrepancies and failure to compensate for all hours worked were not timely paid all wages owed.

111. As a result, Plaintiff and California subclass members are entitled to waiting time penalties pursuant to California Labor Code § 203.

**Count XI**

**Failure to Pay Sick Leave Wages**

*(California Labor Code §§ 245-249)*

*(On Behalf of Plaintiff and the California Subclass)*

112. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

113. The Healthy Workplaces, Healthy Families Act, California Labor Code §§ 245 through 249, requires employers to provide paid sick leave to eligible employees and to provide written notice of available paid sick leave on itemized wage statements or in a separate writing provided on the designated pay date.

114. Because Defendants classified Plaintiff and California subclass members as independent contractors, Defendants did not provide paid sick leave or written notice of available paid sick leave as required by California law.

115. As a result, Plaintiff and California subclass members are entitled to recover unpaid sick leave wages, interest, applicable penalties, attorneys' fees, and costs.

**Count XII**

**Unfair Competition**

*(California Business and Professions Code § 17200 et seq.)*

*(On Behalf of Plaintiff and the California Subclass)*

116. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

117. California's Unfair Competition Law ("UCL"), Business and Professions Code § 17200 et seq., prohibits any unlawful, unfair, or fraudulent business act or practice. Claims for unpaid wages may be pursued as restitution under the UCL, extending recovery to a four-year limitations period under Business and Professions Code § 17208.

118. Defendants' conduct as alleged herein constitutes unlawful business practices because it violates California law, including but not limited to the following:

a. intentionally misclassifying Plaintiff and California subclass members as independent contractors;

b. imposing unreimbursed business expenses on workers and requiring or making unlawful deductions from wages;

c. failing to pay minimum wages and overtime compensation;

d. failing to provide compliant meal periods and rest breaks or pay premium wages in lieu thereof;

e. failing to furnish accurate itemized wage statements;

f. failing to timely pay all wages owed upon separation; and

g. failing to provide paid sick leave and sick-leave notices required by California law.

119. Defendants intended to, and did, profit from these illegal acts by avoiding the costs associated with properly classifying workers as employees and complying with California wage-and-hour laws.

120. As a direct and proximate result of Defendants' unlawful, unfair, and fraudulent business practices, Plaintiff and California subclass members have suffered injury in fact and lost money or property, thereby entitling them to restitution.

121. Pursuant to the Business and Professions Code, Plaintiff and California subclass members are entitled to restitution of money or property acquired by Defendants by means of such unlawful business practices, injunctive relief prohibiting Defendants from continuing their challenged practices, reasonable attorneys' fees and costs, and all other relief available under applicable law.

**Count XIII**

**Unjust Enrichment**

*(On Behalf of Plaintiff and the Nationwide Class)*

122. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

123. Plaintiff and putative class members conferred a substantial benefit on Defendants by performing valuable AI training, data annotation, quality assurance, and related work that is integral to Defendants' core business and revenue generation.

124. Defendants were further enriched by: (a) the avoidance of costs associated with properly classifying workers as employees, including payroll taxes, Social Security and Medicare contributions, unemployment insurance, workers' compensation insurance, and employee benefits; (b) the avoidance of costs associated with compliance with wage and hour laws, including minimum wage, overtime, meal and rest periods, and wage statement requirements; and (c) the profits derived from the work product of Plaintiff and putative class members, which Defendants used to train, evaluate, and improve AI models for their clients.

125. Defendants accepted and retained these benefits with knowledge that Plaintiff and putative class members were not being compensated as required by law. Under the circumstances, it would be unjust and inequitable for Defendants to retain any of the benefits that Plaintiff and putative class members conferred upon them without providing full and lawful compensation.

126. Plaintiff and putative class members are entitled to full restitution and/or disgorgement of all profits, benefits, and other compensation obtained by Defendants from their wrongful conduct. Plaintiff and putative class members may not have an adequate remedy at law, and accordingly, they plead this claim for unjust enrichment in addition to, or in the alternative to, other claims pleaded herein.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Sean Boggs, individually and on behalf of the Class, the California Subclass, and the FLSA Collective, respectfully prays for judgment against Defendants as follows:

1. For an order certifying the proposed Class and California Subclass, appointing Plaintiff as Class Representative, and appointing Plaintiff's counsel as Class Counsel;

2. For a declaratory judgment that Defendants' classification of Plaintiff and putative class members as independent contractors violates California Labor Code § 2775 and the ABC test;
3. For compensatory damages in an amount to be determined at trial, including unpaid minimum wages, unpaid overtime, meal and rest period premiums, unpaid sick leave wages, unreimbursed business expenses, and amounts unlawfully deducted from wages;
4. For statutory penalties authorized by the Labor Code and wage-and-hour claims pleaded herein;
5. For unpaid sick leave wages and other relief available under California Labor Code §§ 245-249;
6. For unpaid minimum wages and overtime compensation, plus an equal amount as liquidated damages, reasonable attorneys' fees, and costs pursuant to the Fair Labor Standards Act, 29 U.S.C. § 216(b);
7. For restitution and disgorgement of all benefits unjustly retained by Defendants as a result of their misclassification of workers and failure to pay lawful compensation;
8. For restitution and disgorgement of all benefits unjustly retained by Defendants as a result of their unfair competition;
9. For reimbursement of all necessary business expenses pursuant to California Labor Code § 2802;
10. For injunctive relief enjoining Defendants from continuing to misclassify workers as independent contractors;
11. For prejudgment and post-judgment interest as permitted by law;
12. For reasonable attorneys' fees and costs of suit pursuant to the Fair Labor Standards Act, California Labor Code § 1194, California Labor Code § 2802, and other applicable statutes;
13. For such other and further relief as this Court deems just and proper.

14. For service awards to Plaintiff in recognition of his service as Class Representative.

**DEMAND FOR JURY TRIAL**

Plaintiffs hereby demand that this matter be tried before a jury.

Date: July 20, 2026

Respectfully submitted:

By: */s/Trenton R. Kashima*

Trenton R. Kashima (SBN 291405)
**BRYSON HARRIS SUCIU**
**& DeMAY PLLC**
19800 MacArthur Blvd., Suite 270
Irvine, CA 92612
Telephone: (212) 946-9389
Email: tkashima@brysonpllc.com

Thomas Bibby*
**BRYSON HARRIS SUCIU**
**& DEMAY PLLC.**
900 W. Morgan Street
Raleigh, NC 27603
Telephone: (610) 273-8272
Email: tbibby@brysonpllc.com

**pro hac vice* forthcoming

*Attorneys for Plaintiffs and the Class*